UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| SNOHOMISH COUNTY PUBLIC HOSPITAL DISTRICT NO. 1,<br><br>                  Plaintiff,<br><br>    v.<br><br>HARTFORD FIRE INSURANCE COMPANY, et al.,<br><br>               Defendants. | CASE NO. C17-1456JLR<br><br>ORDER ON CROSS-MOTIONS FOR PARTIAL SUMMARY JUDGMENT |

## I.  INTRODUCTION

Before the court are the parties' cross-motions for partial summary judgment. (*See* Pl. MSJ (Dkt. # 24); Def. MSJ (Dkt. # 21).)  The court has considered the parties' motions, their submissions in support of and in opposition to the motions, the relevant portions of the record, and the applicable law.  Being fully advised,[1] the court GRANTS

---

[1] Plaintiff Snohomish County Public Hospital District No. 1 d/b/a EvergreenHealth Monroe's ("EHM") requests oral argument on its motion, but the court determines that oral

in part and DENIES in part Plaintiff Snohomish County Public Hospital District No. 1 d/b/a EvergreenHealth Monroe's ("EHM") motion for partial summary judgment, and DENIES Defendant Hartford Fire Insurance Company's ("Hartford") motion for partial summary judgment.

## II.     BACKGROUND

EHM is a "small public hospital in Snohomish County, Washington."  (Compl. (Dkt. # 1-1) ¶ 1.1.)  This is an insurance coverage dispute related to the failure of the hydraulic cylinder—depicted directly below—in EHM's elevator.  (*Id.* ¶ 4.1.)



(1st Pendleton Decl. (Dkt. # 25) ¶ 2.)  The court recounts below the relevant factual and procedural background.

//

//

argument would not help its disposition of the motions.  (*See* Pl. MSJ at 1); Local Rules W.D. Wash. LCR 7(b)(4); *see also Dredge Corp. v. Penny,* 338 F.2d 456, 462 (9th Cir. 1964) (stating that, as a general rule, the court may not deny a request for oral argument made by a party opposing a motion for summary judgment unless the motion is denied).

## A. Factual Background

### 1. The Policy

On October 20, 2015, Hartford issued EHM Policy No. 10 UUN HV1618 ("the Policy") covering November 1, 2015, to October 1, 2016. (1st Pendleton Decl. ¶ 3, Ex. 1 ("Policy") at 3-4; *see also* 1st Adams Decl. (Dkt. # 22) ¶ 2, Ex. 1.)[2] The Policy stated that Hartford "will pay for direct physical loss of or direct physical damage to . . . Covered Property caused by or resulting from a Covered Cause of Loss." (Policy at 4.) Covered Property included "[p]ermanently installed machinery and equipment" (*id.*), and a Covered Cause of Loss included "direct physical loss or direct physical damage that occurs during the Policy Period . . . unless the loss or damage is excluded or limited in this policy" (*id.* at 14). The Policy specifically provided coverage arising from an "Equipment Breakdown Accident to Equipment Breakdown Property." (*Id.* at 20.) The Policy defined an "Equipment Breakdown Accident" as "direct physical loss or direct physical damage" such as "[m]echanical breakdown, including rupture or bursting caused by centrifugal force." (*Id.*) The Policy also defined "Equipment Breakdown Property" as "property . . . that generates, transmits or utilizes energy, including electronic communications and data processing equipment." (*Id.*)

The Policy further contained a "Special Business Income Coverage Form," which covered "the actual loss of Business Income [EHM] sustain[ed] and the actual, necessary

//

---

[2] The evidence in the record contains multiple modes of pagination. For the sake of consistency, the court cites the ECF page numbers unless otherwise noted.

and reasonable Extra Expense [EHM] incur[red] due to the necessary interruption of [its] business operations." (*Id.* at 10.)

The Policy also contained two exclusions relevant here: (1) an underground vessels exclusion, and (2) a corrosion exclusion. The Policy stated that,

> [t]he following is not Equipment Breakdown Property[:] . . . Any sewer piping, any **underground vessels** or piping, any piping forming a part of a sprinkler system or water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system.

(*Id.* at 20-21 (bolding added).) The corrosion exclusion stated that Hartford "will not pay for loss or damage caused by or resulting from any of the following . . . Wear and tear, or change in color, texture, or finish; . . . Rust, **corrosion**, decay, or deterioration." (*Id.* at 20 (bolding added).)

2. <u>Damage to the Hydraulic Cylinder</u>

On April 6, 2016, one of EHM's elevators stopped working properly, and EHM subsequently tendered its claim to Hartford.[3] (*See, e.g.*, 1st Pendleton Decl. ¶ 3, Ex. 3 ("McIntosh Rep.") at 24.) EHM sought the cost of removal, manufacture, expedited shipping, and installation of a new hydraulic cylinder. (*Id.* at 27.) EHM also sought lost business income of $70,000.00. (*Id.*; *see also* 1st Pendleton Decl. ¶ 3, Ex. 4 ("Rog. Ans.") at 42.)

//

---

[3] The record is not clear as to when EHM submitted its claim to Hartford. (*See, e.g.*, McIntosh Rep. at 24.) EHM must have, however, submitted its claim sometime between April 6, 2016—the date of the loss—and May 2, 2016—the date Brian McIntosh, a Loss Control Inspector for Hartford Steam Boiler ("HSB"), made "[i]ntial [c]ontact." (*Id.*)

According to an investigation report by Brian McIntosh, a Loss Control Inspector for Hartford Steam Boiler ("HSB"), one of EHM's elevators began making "a horrible noise." (McIntosh Rep. at 25.) EHM's maintenance department called the elevator manufacturer, ThyssenKrupp, and a technician came to EHM and filled the oil reservoir. (*See id.*) After filling the reservoir, the technician tested the elevator by raising it to the second floor "to see how long the elevator would hold its position." (*Id.*) After only minutes, "the elevator lowered a foot." (*Id.*) EHM then took the elevator out of service overnight, and when the elevator was checked the next morning, it had descended to the first floor. (*See id.*) EHM then "discovered that the elevator hydraulic [cylinder] had a leak." (*Id.*) EHM removed the hydraulic cylinder "from the hole in the elevator pit after the hydraulic oil was pumped out." (*Id.*) The hydraulic cylinder measured approximately 14 feet long and 6 inches in diameter. (*See id.*) The physical damage— depicted in the photo below—to the hydraulic cylinder was "a small hole" that "blew out of a piece of the metal cylinder." (*Id.* at 26.)



(1st Adams Decl. ¶ 4, Ex. 3 at 3.) Mr. McIntosh noted at that time that hydraulic pressure apparently caused the damage. (McIntosh Rep. at 26.) The elevator would be

inoperative until the hydraulic cylinder could be replaced, and because of the inoperative

elevator, one of EHM's tenants had to relocate. (*Id.* at 27.)

On May 6, 2016, Hartford denied EHM's claim on two bases: (1) the elevator did

not meet the definition of covered equipment breakdown because the hydraulic cylinder

was an underground vessel; and (2) the hydraulic cylinder had corroded.[4] (1st Adams

Decl. ¶ 3, Ex. 2 ("5/6/16 Denial") at 4; *see also* 1st Pendleton Decl. ¶ 3, Ex. 8 at 64.)

Internal Hartford emails show that Hartford believed because the cylinder was "below

grade," it was "underground." (1st Pendleton Decl. ¶ 3, Ex. 11 at 74.) The photo below

shows the hole in the ground in which part of the cylinder was housed:



(1st Adams Decl. ¶ 4, Ex. 3 at 3; *see also* 2d Pendleton Decl. (Dkt. # 36) ¶ 2

(authenticating a similar image embedded in EHM's response brief); Pl. Resp. (Dkt. # 34)

at 4 (depicting a similar image).) At least one Hartford agent, however, questioned that

conclusion, because "regardless of location[,] a pump (hydraulic ram) simply pushes or

moves liquid but does not contain or store liquid as would a vessel." (1st Pendleton Decl.

---

[4] Hartford also denied coverage for EHM's lost business income because "coverage for
loss of business income would only be considered if damage occurred to property caused by or
resulting from a covered loss." (5/6/16 Denial at 4.)

¶ 3, Ex. 12 at 78.)  And as of June 28, 2016, a Hartford representative stated that it "still ha[s] no written evidence that confirms that Corrosion was the cause of the Hydraulic [Cylinder] Failure, only [ESI's] report listing Hydraulic Pressure." (*Id.* at 79.)

On September 1, 2016, Parker, Smith & Fleek ("PSF"), EHM's insurance broker, responded to Mr. McIntosh's report and Hartford's denial of coverage.  (1st Pendleton Decl. ¶ 3, Ex. 9 ("1st PSF Letter") at 67-69.)  PSF shared its "belief that the declination was issued in error" because "there were no findings during the investigation that the hydraulic . . . cylinder sustained damage relating to wear and tear, rust or maintenance issues." (*Id.* at 68.)  PSF further stated that "[n]othing in the report makes any reference of the hydraulic [cylinder] being located underground. . . . The pit is below grade but certainly not underground." (*Id.* at 69.)  Hartford responded on September 2, 2016, outlining steps for further investigation of EHM's claim.  (1st Pendleton Decl. ¶ 3, Ex. 10 at 71.)

Because EHM disputed Hartford's conclusion, Hartford agreed to send an independent engineer to inspect the cylinder.  (*See id.*)  The independent engineer, Keith Cline from Engineering Systems Inc. ("ESI"), submitted a report to Hartford on September 26, 2016.  (1st Pendleton Decl. ¶ 3, Ex. 3 ("ESI Rep.") at 31-39.)  Mr. Cline made a number of conclusions, including the following:

1. The elevator hydraulic cylinder leaked from a through-wall perforation in the end cap.
2. Erosion damage caused by high pressure hydraulic fluid flowing through the end cap leak location was sufficient to make determining the original leak cause impossible by visual examination alone.

//

3. A common cause for failure in steel components such as the elevator cylinder is corrosion damage.

(*Id.*) In addition to his report, Mr. Cline attests that "[a]s a result of my inspection, it was my opinion then, and it is my opinion now, to a reasonable degree of certainty under the standards of my profession, that the cause of the cylinder failure was corrosion." (Cline Decl. (Dkt. # 33) ¶ 6.) He states that "given the appearance of the hole," he believed "the corrosion originated on the outer surface," but that destructive testing was necessary to definitively determine the origination.[5] (*Id.*) On September 12, 2016, before finishing his report, Mr. Cline expressed this opinion to HSB's Eric Snyder. (*Id.* ¶ 7.)

Based on ESI's report, on October 10, 2016, Hartford again denied EHM's claim. (1st Pendleton Decl. ¶ 3, Ex. 13 ("10/10/16 Denial") at 82-84.) Hartford stated in its denial letter that "the engineer's findings have confirmed that the elevator hydraulic cylinder failed as a result of corrosion damage," and "[w]e have also confirmed that the hydraulic cylinder was located underground and is not considered Equipment Breakdown Property." (*Id.* at 83-84.) PSF disputed Hartford's conclusions and requested that Hartford again reconsider its coverage position. (*See* 1st Pendleton Decl. ¶ 3, Ex. 14 at 86-89 ("2d PSF Letter").)

On November 16, 2016, Hartford declined to reconsider its decision based on PSF's second follow-up letter. (*See* 1st Pendleton Decl. ¶ 3, Ex. 14 ("11/16/16 Denial") at 91.) Hartford expressly reiterated its position: "[T]here is no coverage for the loss as

_____

[5] "Destructive testing" involves "cutting into the cylinder, and inspecting the inside of the cylinder." (Cline Decl. ¶ 6.)

outlined in our original declination letter sent on October 10, 2016." (*Id.*)  Hartford also

stated that it had "followed up with Mark Anderson of Cozen O'Connor and [was]

advised that destructive testing has been called off and will not be pursued by any of the

parties to the loss."[6] (*Id.*)  Hartford further stated that "[t]he manufacturer, installer,

Cozen O'Connor, and The Hartford have all independently inspected the cylinder and all

have concluded that the damage is the result of corrosion." (*Id.*; *see also* 1st Pendleton

Decl. ¶ 3, Ex. 16 at 94 (stating in a Hartford claims note that Hartford was "not going to

perform destructive testing based on the consensus reached by all parties to the loss that

this was corrosion").)

**B.    Procedural Background**

Based on Hartford's denial of coverage, EHM brought suit on August 14, 2017, in

Snohomish County Superior Court.  (*See* Compl.)  EHM asserted claims for insurance

bad faith and breach of the covenant of good faith and fair dealing (*id.* ¶¶ 5.3-5.6),

negligent claims handling (*id.* ¶¶ 5.7-5.9), breach of contract (*id.* ¶¶ 5.10-5.12), violation

of the Washington Consumer Protection Act, RCW ch. 19.86 (*id.* ¶¶ 5.13-5.16), and

violation of the Insurance Fair Conduct Act, RCW ch. 48.30 (*id.* ¶¶ 5.17-5.20).  On

September 26, 2017, Hartford removed the action to this court.  (*See* Not. of Rem. (Dkt.

# 1).)  On March 22, 2018, EHM moved to amend the case scheduling order and to

*//*

---

[6] Mr. Anderson and Cozen O'Connor represented EHM's tenant that had to relocate
when the elevator stopped working.  (*See* 1st Pendleton Decl. ¶ 3, Ex. 16 at 94 (referring to Mr.
Anderson as "[s]ubro coun[se]l for tenant").)

amend its complaint to add HSB as a defendant.  (MTA (Dkt. # 26).)  The court granted

that motion on April 27, 2018.  (4/27/18 Order (Dkt. # 37).)

The parties cross-move for partial summary judgment.  (*See generally* Pl. MSJ;

Def. MSJ.)  Hartford seeks a declaration that there is no coverage under the Policy

because the Policy excludes underground vessels from coverage.  (Def. MSJ at 1-2.)

EHM seeks a declaration that it is entitled to coverage, and that neither the corrosion nor

the underground vessels exclusion applies.  (Pl MSJ at 2.)  The court now addresses the

motions.

### III.   ANALYSIS

**A.   Legal Standard**

Summary judgment is appropriate if the evidence shows "that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Galen v.

Cty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).  A fact is "material" if it might affect the

outcome of the case.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A

factual dispute is "'genuine' only if there is sufficient evidence for a reasonable fact

finder to find for the non-moving party."  *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986,

992 (9th Cir. 2001) (citing *Anderson*, 477 U.S. at 248-49).  "[W]hen parties submit

cross-motions for summary judgment, each motion must be considered on its own

merits."  *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132,

1136 (9th Cir. 2011) (internal quotation marks and alterations omitted).

//

The moving party bears the initial burden of showing there is no genuine issue of material fact and that it is entitled to prevail as a matter of law. *Celotex*, 477 U.S. at 323. If the moving party does not bear the ultimate burden of persuasion at trial, it can show the absence of a dispute of material fact in two ways: (1) by producing evidence negating an essential element of the nonmoving party's case, or (2) by showing that the nonmoving party lacks evidence of an essential element of its claim or defense. *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000). If the moving party will bear the burden of persuasion at trial, it must establish a prima facie showing in support of its position on that issue. *UA Local 343 v. Nor-Cal Plumbing, Inc.*, 48 F.3d 1465, 1471 (9th Cir. 1994). That is, the moving party must present evidence that, if uncontroverted at trial, would entitle it to prevail on that issue. *Id.* at 1473. If the moving party meets its burden of production, the burden then shifts to the nonmoving party to identify specific facts from which a fact finder could reasonably find in the nonmoving party's favor. *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

The court is "required to view the facts and draw reasonable inferences in the light most favorable to the [non-moving] party." *Scott v. Harris*, 550 U.S. 372, 378 (2007). The court may not weigh evidence or make credibility determinations in analyzing a motion for summary judgment because these are "jury functions, not those of a judge." *Anderson*, 477 U.S. at 249-50. Nevertheless, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Scott*, 550 U.S. at 380 (internal

1  quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,

2  475 U.S. 574, 586-87 (1986)).

3       Furthermore, the court may consider only materials that are capable of being

4  presented in an admissible form.  *See* Fed. R. Civ. P. 56(c)(2); *Orr v. Bank of Am., NT &*

5  *SA*, 285 F.3d 764, 773 (9th Cir. 2002).  "Legal memoranda and oral argument are not

6  evidence and do not create issues of fact capable of defeating an otherwise valid

7  summary judgment."  *Estrella v. Brandt*, 682 F.2d 814, 819-20 (9th Cir. 1982); *see also*

8  *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003) ("Conclusory

9  allegations unsupported by factual data cannot defeat summary judgment.").  Nor can the

10  plaintiff "defeat summary judgment with allegations in the complaint, or with

11  unsupported conjecture or conclusory statements."  *Hernandez v. Spacelabs Med. Inc.*,

12  343 F.3d 1107, 1112 (9th Cir. 2003).

13  **B.**    **Cross-Motions for Summary Judgment**

14       Hartford moves for a declaration that there is no coverage for the damage to the

15  hydraulic cylinder because the cylinder is an underground vessel excluded from coverage

16  under the Policy.  (*See* Def. MSJ.)  EHM seeks summary judgment in its favor that it is

17  entitled to coverage under the Policy and that neither the underground vessel nor the

18  corrosion exclusion apply.  (*See* Pl. MSJ.)

19       1.  <u>Scope of Coverage</u>

20       "An 'all-risk' policy covers any peril that is not specifically excluded in the

21  policy," *Nw. Bedding Co. v. Nat'l Fire Ins. Co. of Hartford*, 225 P.3d 484, 487 (Wash.

22  Ct. App. 2010), and "generally allocate[s] risk to the insurer," *Vision One, LLC v. Phila.*

*Indem. Ins. Co.*, 276 P.3d 300, 306 (Wash. 2012). "But even all-risk policies may exclude certain perils . . . ." *Nw. Bedding*, 225 P.3d at 487. The loss must also be fortuitous, a requirement comprising "three components: (a) a loss which was certain to occur cannot be considered fortuitous, and may not serve as the basis for recovery under an all-risk insurance policy; (b) in deciding whether a loss was fortuitous, a court should examine the parties' perception of risk at the time the policy was issued; [and] (c) ordinarily, a loss which could not reasonably be foreseen by the parties at the time the policy was issued is fortuitous." *Frank Coluccio Constr. Co., Inc. v. King Cty.*, 150 P.3d 1147, 1156 (Wash. Ct. App. 2007). The fortuity showing is not particularly onerous. *See id.*

The court looks to the "language of the policy to ensure that the parties contemplated coverage for the ensuing loss." *Vison One*, 276 P.3d at 308. Accordingly, the insured must first demonstrate that "the loss falls within the scope of the policy's covered losses," and the insurer must then demonstrate that "the claim of loss is excluded." *Nw. Bedding*, 225 P.3d at 487. Thus, the court first determines whether EHM has established that the damage to the elevator falls within the scope of the Policy.[7]

---

[7] Hartford argues that "[t]he equipment breakdown coverage [in the Policy] is not all risk, but instead defines a specific peril," such that EHM has the "burden to show that there was an equipment breakdown accident to equipment breakdown property in order to meet the insuring agreement of the additional coverage." (Def. Resp. (Dkt. # 31) at 8.) Hartford contends that EHM cannot make that showing because the hydraulic cylinder is an expressly excluded underground vessel. (*See id.*) However, even if the court framed the issue in the slightly different manner Hartford advances, the result is the same: EHM must demonstrate that there is coverage under the Policy, and the court then determines whether there is a genuine dispute of material fact regarding whether the cylinder constitutes an underground vessel.

The Policy covered "direct physical loss or direct physical damage to Covered Property," which the Policy further defined as "[p]ermanent installed machinery and equipment." (Policy at 4.) The Policy also covers "Equipment Breakdown Accident to Equipment Breakdown Property," which extends to "[m]echanical breakdown, including rupture or bursting caused by centrifugal force" to "property . . . that generates, transmits or utilizes energy." (*Id.* at 20.) The damaged hydraulic cylinder falls within both of those provisions because it constitutes permanent installed machinery and is property utilizing energy that suffered a mechanical breakdown. (*See* Pl. MSJ at 11; *see also* Def. Resp. at 8 (stating that EHM has the burden of proving coverage and arguing only that EHM cannot demonstrate that there was an equipment breakdown accident to equipment breakdown property—i.e., the hydraulic cylinder—because the cylinder is an underground vessel and therefore not equipment breakdown property).)

In addition, the loss was fortuitous. (*See* Pl. MSJ at 11.) There is no indication in the record that this kind of event was "certain to occur" or perceived as a risk at the time Hartford issued the Policy. *Frank Coluccio Constr.*, 150 P.3d at 1156. And based on the evidence before the court, the loss "could not reasonably be foreseen by the parties at the time the policy was issued." *Id.* Having found that the Policy covers the damage, the court now determines whether the two exclusions at issue nevertheless bar coverage.

2. <u>Underground Vessels Exclusion</u>

Whether the underground vessels exclusion applies depends on what the term "underground vessel" means. (*Compare* Def. MSJ at 9, *with* Pl. MSJ at 2.) Hartford argues that the hydraulic cylinder is an underground vessel because it "sits in an earthen

hole extending 14 feet below the surface of the ground" and "is cylindrical in shape . . .[,] of tight construction . . . and holds both the piston, and liquid." (Def. MSJ at 9.) Under Hartford's characterization, coverage is excluded. (*See* Policy at 20-21.) EHM, for its part, argues that the hydraulic cylinder is not an underground vessel for three reasons. (Pl. MSJ at 2.) First, "the elevator's component parts cannot be dissected for purposes of applying a coverage exclusion." (*Id.*) Second, even if each part were analyzed separately, the cylinder "protrudes above the floor in an open elevator shaft" and therefore is not underground. (*Id.*) And third, Washington law requires the court to construe the coverage exclusion strictly against Hartford. (*Id.*)

When a policy does not define a term, the court gives that term "its ordinary meaning." *Vision One*, 276 P.3d at 306. "To determine the plain meaning of an undefined term, courts often refer to standard English dictionaries." *Int'l Marine Underwriters v. ABCD Marine, LLC*, 313 P.3d 395, 400 (Wash. 2013) (referencing Webster's Third New International Dictionary). "[T]he fact that a term is undefined does not automatically render a provision ambiguous." *Id.* Once the court has interpreted the policy, the court then construes exclusions strictly against the insurer. *Vision One*, 276 P.3d at 306; *see also ABCD Marine*, 313 P.3d at 402 ("After interpreting an insurance policy, the court must construe it, i.e., determine its legal effect.").

The court first analyzes the question common to both motions—whether the hydraulic cylinder is an underground vessel. Both parties agree that the Policy does not define that phrase. (*See* Pl. MSJ at 15; Def. MSJ at 8.) Thus, the court must give the term its plain and ordinary meaning and refers to Webster's Third New International

Dictionary to do so.  *See* Webster's Third New Int'l Dictionary (2002).  The dictionary defines "underground" as "being, growing, or situated below the surface of the ground."  *See Underground*, Webster's Third New Int'l Dictionary (2002).  It defines "vessel" as "a hollow and usu[ally] cylindrical or concave utensil (as a hogshead, bottle, kettle, cup, or bowl) for holding something and esp[ecially] a liquid : a receptacle of tight construction sometimes as distinguished from one (as a basket) of slack or open construction."  *See Vessel*, Webster's Third New Int'l Dictionary (2002).

Informed by those definitions, the court concludes that the hydraulic cylinder is not an underground vessel and accordingly, that the exclusion does not apply.  As both parties acknowledge, only part of the cylinder is in a hole extending below ground.  (*See* Pl. MSJ at 18; Def. MSJ at 9.)  For example, EHM's Plant Operations Manager, Damien Fannin, states that "[b]efore it was removed for inspection, the hydraulic cylinder sat in a steel-lined hole at the bottom of the elevator shaft."  (Fannin Decl. (Dkt. # 35) ¶¶ 2-3.)  According to Mr. Fannin, "[r]oughly two feet of the hydraulic cylinder protruded above the floor, and the remaining twelve feet was in the steel-lined hole."  (*Id.* ¶ 3.)  Because the entire cylinder is not situated below ground, however, it stretches the ordinary meaning of the word "underground" too far to characterize the cylinder as "being . . . or situated below the surface of the ground."  *See Underground*, Webster's Third New Int'l Dictionary (2002); *see also Leanderson v. Farmers Ins. Co. of Wash.*, 43 P.3d 1284, 1286 (Wash. Ct. App. 2002) (internal quotation marks omitted) ("[E]xclusions from coverage of insurance will not be extended beyond their clear and unequivocal meaning.").

*//*

Instead, only a portion of the cylinder extends below the surface of the ground, and therefore the hydraulic is not "underground" as that word is plainly understood.

In addition, the hydraulic cylinder cannot be considered a "vessel." It is simply not a "utensil" similar to "a hogshead, bottle, kettle, cup, or bowl." *Vessel*, Webster's Third New Int'l Dictionary (2002). In addition, although the cylinder holds liquid—hydraulic fluid—it does so not because its purpose is to hold liquid but because the cylinder requires that liquid for its operation. *Cf. id.* (suggesting that the purpose of a "vessel" is to hold something). Thus, the underground vessel exclusion does not apply because the plain meanings of those words—in isolation and read together—bear no resemblance to the hydraulic cylinder.

The phrases surrounding the term "underground vessel" further bolster the court's interpretation of that phrase. The entire paragraph that includes the underground vessel language excludes from coverage:

> Any sewer piping, any underground vessels or piping, any piping forming a part of a sprinkler system or water piping other than boiler feedwater piping, boiler condensate return piping or water piping forming a part of a refrigerating or air conditioning system.

(Policy at 20-21.) The exclusion describes multiple kinds of piping but does not address an apparatus similar to the hydraulic cylinder. (*See id.*); *see also supra* p.2 (showing a picture of the hydraulic cylinder). Thus, the surrounding language in the exclusion provides no support for interpreting "underground vessel" as encompassing the hydraulic cylinder here.

*//*

1     For those reasons, the court denies Hartford's motion for partial summary

2 judgment, and grants EHM's motion on this issue. The court now turns to EHM's

3 motion for a ruling that the corrosion exclusion does not bar coverage.

4     3. <u>Corrosion Exclusion</u>

5     As a preliminary matter, EHM argues that because the parties agreed "to forgo

6 reply briefs" and EHM needed "to avoid filing two contemporaneous summary judgment

7 motions," EHM "will not have an opportunity to respond to Hartford's position on the

8 'corrosion' exclusion." (Pl. Resp. (Dkt. # 34) at 17.) Thus, EHM requests that the court

9 disregard any attempt by Hartford to "create an issue of fact with declarations from its

10 adjusters or expert investigators." (*Id.*) The court will not do so.

11     Assuming EHM meets its initial burden of demonstrating a lack of evidence

12 supporting Hartford's reliance on the corrosion exclusion, Hartford then has the burden

13 of coming forth with evidence demonstrating that it in fact had a basis for relying on that

14 exclusion. *See Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252. Furthermore, EHM

15 waived its right to file a reply brief and cannot now request that the court disregard

16 Hartford's evidence because EHM could not respond. *Cf.* Local Rules W.D. Wash. LCR

17 7(b)(3) (expressly contemplating that the moving party may elect not to file a reply brief

18 and that the court would then decide a motion without the benefit of that filing). The

19 court now examines whether there is a genuine dispute of material fact regarding whether

20 either of Hartford's investigations determined corrosion caused the loss.

21     EHM contends that neither of the two investigations Hartford relied on in

22 applying the corrosion exclusion—Mr. McIntosh's initial report and ESI's later report—

determined that corrosion caused the damage to the hydraulic cylinder. (Pl. MSJ at 12.) Thus, EHM asserts that there is no evidence supporting Hartford's denial on that basis. (*Id.*) Hartford argues, however, that there is a genuine dispute of material fact regarding the corrosion issue, and therefore judgment as a matter of law is inappropriate. (Def. Resp. at 6-8.)

EHM is correct that Mr. McIntosh's report fails to support Hartford's position on corrosion. Mr. McIntosh's report stated that "it appears that the hydraulic pressure caused a small hole which blew out a piece of the metal cylinder." (McIntosh Rep. at 25.) Indeed, Hartford concedes that "Mr. McIntosh did not mention corrosion as a cause of the loss," arguing instead that his "report did not foreclose the possibility that corrosion had weakened the cylinder, such that allowed the hydraulic failure to occur." (Def. Resp. at 3.) Were only Mr. McIntosh's report before the court, there would be no genuine dispute of material fact regarding corrosion as a cause of damage to the hydraulic cylinder.

However, Hartford presents evidence sufficient to overcome summary judgment. In his report, Mr. Cline identified corrosion as a likely cause of the damage. (ESI Rep. at 38.) Specifically, he stated that (1) a "common cause of failure in steel components such as the elevator cylinder is corrosion damage" and (2) the cylinder's "general appearance would indicate the damage mechanism that caused the perforation and subsequent leak

//

//

//

likely originated on the outer surface of the cylinder."[8] (*Id.* at 37.) However, he noted that a visual examination—which he had undertaken—was insufficient to conclusively determine the cause of the damage and that destructive testing "would be required to positively determine the cause" of the loss. (*Id.* at 38.) He further explained that the destructive testing would have confirmed "that the corrosion originated on the outer surface," not whether corrosion occurred at all. (Cline Decl. ¶ 6 (stating that "the cause of the cylinder failure was corrosion," but that he "could not positively confirm that the corrosion originated on the outer surface as opposed to the inner surface").) Before Mr. Cline finished his report, he notified Mr. Snyder that "this is an issue dealing with corrosion," which Mr. Snyder memorialized in his notes. (2d Adams Decl. (Dkt. # 32), Ex. 2 at 4; *see also* Cline Decl. ¶ 7.)

In addition, Hartford's Brian Yannuzzi spoke with a ThyssenKrupp representative and memorialized the conversation in his notes by stating that "'electrolysis ha[d] likely eaten away at the cylinder wall.'" (Def. Resp. at 6 (quoting 2d Adams Decl. ¶ 1, Ex. 1 at 6).) Thus, although there are some inconsistencies in the record, ESI's report and Mr. Yannuzzi's claim notes demonstrate a genuine dispute of material fact as to whether Hartford's investigations supported corrosion as a source of the damage.[9]

---

[8] In response to EHM's motion, Mr. Cline states that "when [he] referred to the 'damage mechanism' that caused the perforation and subsequent leak that likely originated on the surface, [he] was referring to corrosion." (Cline Decl. ¶ 8.)

[9] For example, Hartford's claim notes reflect that a representative stated on June 28, 2016, "[w]e still have no written evidence that confirms that Corrosion was the cause of the Hydraulic [Cylinder] Failure, only [Mr. McIntosh's] report listing Hydraulic Pressure." (1st Pendleton Decl. ¶ 3, Ex. 12 at 78.) However, ESI issued its report in September 2016 and concluded that corrosion likely caused the damage. (*See* ESI Rep.; Cline Decl. ¶ 6.)

EHM's arguments to the contrary are unavailing. For example, EHM argues that Mr. Yannuzzi's supervisor, Curt Coffman, determined that the cylinder had "rusted out" after "reviewing a handful [of] photographs while sitting at his desk." (Pl. MSJ at 13.) EHM contends that "Mr. Coffman's unsupported and uninformed finding of corrosion does not create an issue of material fact." (*Id.*) But even if Mr. Coffman's opinion is insufficient, the findings in Mr. Cline's report and Mr. Yannuzzi's claim notes are sufficient at this stage of the proceedings to demonstrate a genuine dispute of material fact regarding whether Hartford's investigation supported relying on the corrosion exclusion.[10] Furthermore, although Hartford did not definitively pin down corrosion as the cause, the investigators' conclusions were based on their observations, experience, and expertise. *Cf. Commonwealth Ins. Co. v Maryland Cas. Co.*, No. C02-2222MJP, 2005 WL 1288000, at *6 (W.D. Wash. May 13, 2005). Indeed, the fact that Hartford did not conduct the destructive testing provides no basis—at this stage of the proceedings and as EHM presents its motion—for entry of summary judgment. (*See* Cline Decl. ¶ 6 (stating that "the cause of the cylinder failure was corrosion," but that he "could not positively confirm that the corrosion originated on the outer surface as opposed to the inner surface").) Thus, Hartford has demonstrated a genuine dispute of material fact regarding whether the investigations revealed a basis for invoking the corrosion

---

[10] EHM also states that "Hartford cannot carry its heavy burden of demonstrating applicability of the corrosion exclusion by relying on ESI's speculative statements." (*Id.* at 14.) However, Hartford's burden in response to EHM's initial showing is not to demonstrate that the corrosion exclusion in fact applies and bars coverage, but only to demonstrate a genuine dispute of material fact. *See Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 252.

exclusion.  The court therefore denies EHM's motion for summary judgment on this

issue.

## IV.  CONCLUSION

For the foregoing reasons, the court DENIES Hartford's motion for partial

summary judgment (Dkt. # 21) and GRANTS in part and DENIES in part EHM's motion

for partial summary judgment (Dkt. # 24).

Dated this 15th day of May, 2018.

_____

JAMES L. ROBART
United States District Judge